In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-2844

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GERALD S. SEWELL,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:20-cr-30098-NJR-1 — **Nancy J. Rosenstengel,** *Chief Judge.*

ARGUED APRIL 2, 2024 — DECIDED JUNE 10, 2024

Before ROVNER, HAMILTON, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* We face another appeal questioning the need to give the jury an entrapment instruction where a law enforcement sting operation results in federal charges for attempted enticement of a minor. Line drawing in this area is difficult, for the law permits the use of sting operations to solicit the crime but not to entrap—in short, not to induce someone who is otherwise not predisposed to commit the crime. This case falls on the easier side of the divide, as the

undercover FBI agent who posed as a 15-year-old girl on Craigslist did no more than solicit Gerald Sewell's participation in sexual activity, while Sewell pressed for the encounter to occur. On these facts, the district court committed no error in denying Sewell's request for a jury instruction on entrapment. So we affirm.

## I

### A

On June 27, 2020, Gerald Sewell took to Craigslist seeking a sexual encounter. He responded to a post on the "Missed Connections" page and in short order found himself in a conversation with someone he believed was a 15-year-old girl named Brionica but who turned out to be an undercover FBI agent. The conversation, which lasted just under six hours, quickly turned sexual, with the two planning to meet later the same day. They exchanged photos, discussed their age difference, and in no uncertain terms conveyed their respective sexual interests. That same afternoon Sewell drove across state lines from Missouri to Illinois to what he believed was Brionica's home where he promptly found himself under arrest.

### B

Federal charges followed, with Sewell being indicted both for attempted enticement of a minor (18 U.S.C. § 2422(b)) and for traveling across state lines with intent to engage in illicit sexual conduct (18 U.S.C. § 2423(b)). He pleaded not guilty, chose to go to trial, and asked the district court for a jury instruction on entrapment. The district court deferred ruling on the motion until the close of evidence and then denied Sewell's request. The district court saw no evidence of persistent persuasion by the undercover agent and no reluctance by

Sewell. To the contrary, the court found the government properly used the sting operation to solicit the crime without overstepping and inducing Sewell.

The jury convicted Sewell on both counts. Section 2422(b) carries a mandatory minimum of ten years' imprisonment, so the district court imposed concurrent ten-year sentences on both counts.

Sewell now appeals, challenging the district court's denial of an entrapment instruction.

## II

Our role as a court of review is to take a fresh and independent look at Sewell's challenge to the district court's decision not to provide an entrapment instruction. See *United States v. Mercado*, 53 F.4th 1071, 1079 (7th Cir. 2022).

## A

Our *en banc* decision ten years ago in *United States v. Mayfield* established a careful and durable framework for evaluating claims of government entrapment. 771 F.3d 417 (7th Cir. 2014). We explained that "[e]ntrapment is a defense to criminal liability when the defendant was not predisposed to commit the charged crime before the intervention of the government's agents and the government's conduct induced him to commit it." *Id.* at 420. The defense "has two distinct" but "conceptually related" elements: (1) "government inducement" and (2) "lack of predisposition." *Id.* at 430. And the law entitles a defendant to an entrapment instruction "whenever there is sufficient evidence from which a reasonable jury could find entrapment." *Id.* at 429 (quoting *Mathews v. United States*, 485 U.S. 58, 62 (1988)). In making that determination, the district court must avoid "weigh[ing] the evidence or

decid[ing] whether the defense is believable" and instead determine if there is "more than a scintilla of evidence of entrapment." *Mercado*, 53 F.4th at 1079–80 (explaining that once the defendant proffers some evidence on both prongs of the defense, the burden of disproving entrapment shifts to the government).

Inducement, we have explained, "requires more than government solicitation of the crime," as "the fact that the government's agents initiated contact with the defendant and offered an ordinary opportunity to commit the charged crime is insufficient to raise an entrapment defense." *Mayfield*, 771 F.3d at 433. We have described the "something more" that is required as "plus factors," *Mercado*, 53 F.4th at 1083, meaning "some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *Mayfield*, 771 F.3d at 434–35. Those factors, we elaborated in *Mayfield*, might take many forms, including but not limited to:

> repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship, or any other conduct by government agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts.

*Id.* at 435.

When it comes to the predisposition prong, the focus shifts from the government to the defendant. Predisposition "refers

to the likelihood that the defendant would have committed the crime without the government's intervention, or actively wanted to but hadn't yet found the means." *Id.* at 436. The necessary assessment is "chiefly probabilistic, not psychological." *Id.* at 428. As we explained in *United States v. Anderson*, "*Mayfield* measures predisposition based not on *why* the defendant might or might not commit the crime but on *whether* the defendant would have committed the crime, more likely than not, without the government's inducement." 55 F.4th 545, 553 (7th Cir. 2022) (emphasis in original).

B

District courts regularly encounter claims of entrapment made by defendants charged with attempted enticement of a minor as a result of a sting operation. Indeed, we see many similar appeals, and two recent decisions help inform our application of *Mayfield*'s framework to Sewell's case.

In *United States v. Anderson*, we considered a challenge to the district court's denial of a requested entrapment instruction in circumstances where an undercover agent, posing as a 15-year-old, made at least eleven direct requests for a sexual encounter over a two-day period. See *id.* at 550. Anderson repeatedly expressed reluctance, a desire not to go to jail, and fear for the welfare of his daughter if he were to be convicted and have to serve time. See *id.* at 554. But the undercover agent did not relent, promising and then reassuring Anderson that their relationship would remain secret. See *id.* As the time of their planned meeting approached, Anderson again hesitated but the agent pressed for the sexual rendezvous to occur by "employ[ing] guilt" and remarking, I "just wish you would have told me earlier. I was excited." *Id.*

Although observing that there was "no minimum number of times the government must invite the defendant to commit the crime" to constitute inducement, we concluded that Robert Anderson's jury should have received an entrapment instruction. *Id.* at 555. We emphasized that the agent not only was the first to "propose[] sex with an underage partner," but also then engaged in a two-day campaign of persistent "coaxing and persuad[ing]" despite Anderson's reluctance throughout the chat communications. *Id.* at 549–50. (While that evidence sufficed to warrant an entrapment instruction, the jury at Anderson's second trial still convicted him, finding the government disproved entrapment beyond a reasonable doubt.)

We reached a contrary conclusion in *United States v. Mercado*, where we affirmed the district court's denial of an entrapment instruction because the government's conduct did not entail any *Mayfield* plus factors. See 53 F.4th at 1084. Rafael Mercado exchanged numerous messages over the course of five days with an undercover agent posing as a 15-year-old girl named Alexis. See *id.* at 1074. Although the agent was the first to allude to a sexual encounter, the record showed that the sexual overture was nothing more than a "solicitation[] or invitation[]"—not inducement. *Id.* at 1082. Rather than "repeatedly declin[ing] persistent government pressure," Mercado was the one who injected sexual content into the conversation, including by asking for revealing photographs of Alexis. *Id.* at 1081–82. Like the district court, we saw no error in denying an entrapment instruction because the government merely "furnished Mercado the chance to commit th[e] crime on customary terms—a text conversation on a hook-up website followed by a meeting." *Id.* at 1085.

**III**

Turning to Sewell's case, the district court chose to focus on the inducement prong, and we follow suit. See *United States v. Plowman*, 700 F.3d 1052, 1057 (7th Cir. 2012) (explaining that when evidence of inducement is lacking "there is no need to consider predisposition" (quoting *United States v. Pillado*, 656 F.3d 754, 764 (7th Cir. 2012)). Viewing the evidence in the light most favorable to Sewell, we see no evidence of inducement, only solicitation of the crime, which is insufficient to put the entrapment defense before the jury. See *Anderson*, 55 F.4th at 555; *Mercado*, 53 F.4th at 1082.

A

Sewell urges us to focus our analysis on how the conversation started, with the undercover agent (posing as Brionica) introducing the prospect of sexual activity by expressing interest in "a fun discreet time." That conduct, Sewell insists, constitutes inducement that permeated the ensuing discussion. We are not persuaded.

Sewell's general observation is accurate—yes, it was the agent who first raised the prospect of a sexual encounter. But that happened at the outset of a discussion that continued for another four and a half hours and before the agent revealed Brionica's age—15. Put another way, the undercover agent began the discussion with Sewell by, at most, soliciting his interest in connecting to engage in sexual activity. The relevant focus, however, is on what the agent said (and did not say) and how Sewell reacted once Brionica's age became known. It is on that score that Sewell's argument falters.

Focusing on the conversation that transpired after Brionica revealed her age, Sewell took an active role in arranging

their encounter. And he made plain that he wanted to meet to engage in sexual activity: He kept the discussion focused on sexually explicit activity, even offering and requesting ideas for specific sex acts the two could engage in together.

An important detail also stands out from our review of the chat transcript. At several points Brionica delayed responding to Sewell—for example, after he asked a question or sought a reaction to a suggestion. During many of these pauses, Sewell did not wait for a response, but instead continued to send messages asking where he and Brionica should meet, the time he should arrive, and suggesting specific sexual activities the two should engage in. One of the pauses lasted thirty-eight minutes and ended when Sewell reinitiated the conversation by asking for Brionica's address for the seventh time.

The transcript leaves us of the clear view that it was Sewell who encouraged someone he believed to be a 15-year-old girl to meet for a sexual rendezvous. Rather than ratcheting up the pressure, the agent posing as Brionica gave Sewell time to consider his actions by responding slowly, frequently letting ten or more minutes pass between messages. And time and again Sewell, not Brionica, pressed to solidify plans for their sexual encounter, ultimately leading to Sewell driving from his home in Missouri to Illinois to meet her.

B

Sewell urges a different perspective, seeing his case as analogous to the circumstances we considered in *Anderson*. He identifies three points in the chat where, on his reading, he hesitated and Brionica responded inducing him to commit the crime. The problem with Sewell's argument is not just that three overtures on the part of the agent pales in comparison

to the eleven in *Anderson*. See 55 F.4th at 555 (explaining there is "no minimum number of times the government must invite the defendant to commit the crime"). The more significant problem is that in *Anderson* the agent employed other inducing tactics that are absent from Sewell's case here. Those tactics included the agent's repeated reassurances to keep the sexual encounter a secret and use of guilt to quell Anderson's apprehension. See *id.* at 554–55.

We see nothing analogous here. Brionica did little to nothing to reassure Sewell. Indeed, the transcript shows Sewell needed no reassurance. For example, when Sewell was preparing to drive to Illinois he hesitated, explaining: "I really want to do this but you are under age for me. I wish you are 18." After Brionica replied, "So I don't get a choice??? I don't need to know ur real name," Sewell pressed, "What about the police, I want you for sure." But after four minutes passed without a response, Sewell chimed in by affirmatively saying, "I'm on my way." Rather than "repeatedly declining escalating government pressure," *Mercado*, 53 F.4th at 1082, Sewell set aside whatever misgivings may have crossed his mind, got in his car, and drove across state lines to meet someone he believed was 15 years old. Even if Brionica's response could be interpreted as guilt or a reassurance, it does not rise to the level we found necessitated an entrapment instruction in *Anderson*. See 55 F.4th at 555.

In the final analysis, the better comparison is between this case and *Mercado*. Rafael Mercado, like Gerald Sewell, "rais[ed] sexual topics," solicited photographs, and repeatedly initiated contact with the agent. *Mercado*, 53 F.4th at 1081–82. Both seemed to, at some points, relish the idea of being with a 15-year-old child, *id.* at 1075, 1077, with Sewell

remarking how he enjoyed "younger women." Sewell, also like Mercado, took the lead in arranging the meet-up in extreme and graphic detail. See *id.* at 1075–77. In both cases, the chat transcript reveals the defendant actively pursuing the opportunity to commit the crime with minimal encouragement on the part of the agent. See *id.* at 1081. While in *Mercado* the agent was the first to express interest in "more than Netflix and chill," we saw that comment as reflecting nothing more than solicitation of the crime. *Id*. at 1076, 1081–82. The same goes for Brionica's remark that she was looking for "a fun discreet time."

Evaluating Sewell and Brionica's conversation as a whole, *id.* at 1081, the agent's scant reassurances were unaccompanied by any *Mayfield* plus factors. The "sting operation" that culminated in Sewell's arrest "mirror[ed] the customary execution of the crime charged" and the government's efforts did not amount to anything "more … either in terms of the character and degree of the government's persistence or persuasion, or the nature of the enticement or reward." *Mayfield*, 771 F.3d at 433. Unlike *Anderson* where the government's frequent requests were coupled with other plus factors including guilt, 55 F.4th at 555, the government's conduct here posed no risk of inducing Sewell's criminality "rather than ca[tching]" it. *United States v. Barta*, 776 F.3d 931, 939 (7th Cir. 2015). The government furnished Sewell the "ordinary opportunity to commit the charged crime" and he eagerly took it. *Mayfield*, 771 F.3d at 433. Because the district court properly denied his requested entrapment instruction, we AFFIRM.